**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| SUZANNE STEWART, | § |
| | § |
| *Plaintiff,* | § |
| VS. | §     CIVIL ACTION NO. 4:23-cv-4387 |
| | § |
| CITY OF ARCOLA, | § |
| | § |
| *Defendant.* | § |

## ORDER

Pending before the Court is City of Arcola's ("Defendant" or "City") Motion for Summary Judgment. (Doc. No. 22). Suzanne Stewart ("Plaintiff") responded in opposition. (Doc. No. 26). Defendant filed a reply. (Doc. No. 28). Plaintiff also moved to strike Defendant's summary-judgment evidence, (Doc. No. 24), to which Defendant responded in opposition, (Doc. No. 29). Plaintiff did not file a reply in support of the motion to strike.

Having considered the motions, relevant pleadings, summary-judgment evidence, and applicable law, the Court **DENIES IN PART** and **GRANTS IN PART** Plaintiff's Motion to Strike, (Doc. No. 24), and **DENIES** Defendant's Motion for Summary Judgment, (Doc. No. 22).

### I.    Background

This is a gender discrimination and retaliation suit against the City of Arcola. Plaintiff began her employment with the City of Arcola as a reserve officer in the Arcola Police Department on October 23, 2020. (Doc. No. 26-1 at 1). In that capacity, Plaintiff had multiple supervisors, including the Chief of Police, Raymond Stewart ("Chief Stewart"), and the Mayor, Fred Burton ("Mayor Burton"). (*Id.*). Chief Stewart is also Plaintiff's husband. (*Id.*). Moreover, Chief Stewart and Mayor Burton "were close personal friends well before [Chief Stewart and Plaintiff] got married," so much so that the Stewarts "have been to Fred Burton's house before for parties." (*Id.*).

On at least two occasions, Mayor Burton allegedly called Plaintiff "overweight lover."
While the exact date is unclear, one such occasion was before on or before June 3, 2021. On June
3, 2021, Plaintiff sent an email to Mayor Burton complaining of the comment.[1] (Doc. No. 26-4 at
151:2–8); (Doc. No. 26-1 at 2). In response, Mayor Burton allegedly accused Plaintiff of trying to
"make a paper trail against him." (Doc. No. 26-1 at 2). At other times, Plaintiff declares in her
affidavit, Mayor Burton would make "threatening" comments, such as "You need this job, don't
you?" and "You need insurance from this job, right?" The second and the last instance of the
"overweight lover" comment was on November 12, 2021, during the City's annual barbecue cook-
off. (*Id.* at 3). This time, however, it was said on a microphone in front of approximately 200 to
300 people when announcing Plaintiff's team had won the barbecue competition. (*Id.*); (Doc. No.
26-2 at 3).

As Plaintiff and Chief Stewart swear in their affidavits, this was not the extent of Mayor
Burton's comments to women. For example, in July 2021, Mayor Burton allegedly commented, in
front of Plaintiff, that "[he]'d bump that bunny" about then-Sergeant, later-Chief of Police Arika
Carr ("Sergeant Carr"). (Doc. No. 26-1 at 2). Plaintiff also witnessed Mayor Burton ask Sergeant
Carr, who was pregnant at the time, "How long do I have to see you looking like that?" (*Id.* at 3).
Moreover, Plaintiff and Chief Stewart both independently swear that Mayor Burton referred to an
employee named Tamara Alex as "an old dinosaur bitch." (*Id.*); (Doc. No. 26-2 at 3). In the Fall of
2021, Mayor Burton issued a directive that women could not work night shifts because "it was too
dangerous for women to work at night." (Doc. No. 26-1 at 3); (Doc. No. 26-2 at 2); (Doc. No. 26-
4 at 209:15–18).

---

[1] The contents of that email are unknown to the Court.

2

Between November 15 and 19, 2021, a week or so after the public "overweight lover" comment at the barbecue cook-off, Plaintiff "verbally made an official report to Chief Raymond Stewart for Fred Burton sexually harassing [her]." (Doc. No. 26-1 at 3). "Sometime [sic] before the last week of November of 2021, but before Friday December 3, 2021," Chief Stewart "relayed [Plaintiff's] sexual harassment complaint to Mayor Fred Burton." (Doc. No. 26-2 at 3). In response, Mayor Burton stated, "You need to fix that. She's your wife." (*Id.*). Chief Stewart swears that he "made it clear in this conversation with Fred Burton that [Plaintiff] was reporting a sexual harassment as an employee of the City of Arcola." (*Id.*). On December 13, 2021, about a week after that conversation between Chief Stewart and Mayor Burton, Chief Stewart was discharged as the Chief of Police for the City of Arcola. (*Id.* at 4). In the meeting to announce Chief Stewart's discharge, Mayor Burton allegedly stated to Arcola police officers, "I am removing the Stewart umbrella of protection. I'm the Chief now. Stewart keeps telling me not to say stuff, but I'm the mayor, and I'm the chief." (*Id.*); (Doc. No. 22-1 at 53:24–54:15).

After that meeting, Plaintiff asked Mayor Burton to speak "Fred to Suzanne . . . on a personal level," given their friendship through Chief Stewart. (Doc. No. 22-1 at 55:1–2). Mayor Burton agreed to speak if Plaintiff would walk with him. (*Id.* at 55:3–5). In that conversation, Plaintiff stated, "You should be ashamed of yourself. How do you sleep at night? You're allowing your girlfriend to dictate how you handle the police department." (*Id.* at 55:11–16). That "girlfriend" referred to Dr. Annette Goldberg, the City Manager, with whom Plaintiff accused Mayor Burton of having an extramarital affair. (*Id.* at 63:1–12). Plaintiff swears in her affidavit that, in this conversation, she once again complained about "the way he talked to [her] and called [her] 'overweight lover.'" (Doc. No. 26-1 at 3).

The next day, on December 14, 2021, Mayor Burton terminated Plaintiff's employment as "a direct result of policy violations related to insubordination and [her] unprofessionalism." (Doc. No. 22-1 at 58:23–59:7).

Plaintiff filed suit in this Court alleging disparate treatment, hostile work environment,[2] and retaliation. (Doc. No. 1). The Court subsequently granted in part and denied in part Defendant's Motion to Dismiss, dismissing the disparate treatment claim but leaving in place the hostile work environment and retaliation claims. (Doc. No. 17). Now, Defendant moves for summary judgment on the remaining claims. (Doc. No. 22).

## II.    Legal Standard

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary

---

[2] While Plaintiff's Complaint does not specifically allege a hostile work environment claim, the Court "liberally construe[d] the complaint to state a hostile work environment claim under Title VII" due to its allegation that Burton's behavior was "so severe or pervasive that it altered the conditions of [Plaintiff's] employment." *See* (Doc. No. 17 at 5 n.1) (Order on Motion to Dismiss).

4

judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248. It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.*

### III.    Analysis

The Court will analyze Plaintiff's Motion to Strike first, (Doc. No. 24), then Defendant's Motion for Summary Judgment, (Doc. No. 22).

### A.    Motion to Strike

Plaintiff argues that two pieces of summary-judgment evidence should be stricken from the record: Defendant's Exhibit 4, (Doc. No. 22-4), and Defendant's Exhibit 9, (Doc. No. 22-9). (Doc. No. 24 at 1).

The basis for Plaintiff's argument to strike Exhibit 4 is that it contains Plaintiff's full date of birth and social security number. (*Id.* at 2); *see* (Doc. No. 22-4 at 1) (showing Plaintiff's full name, address, phone number, full date of birth, and full social-security number). Rule 5.2 of the Federal Rules of Civil Procedure states that, "in an electronic or paper filing with the court that contains an individual's social-security number . . . or birth date . . . a party or nonparty making the filing may include only: (1) the last four digits of the social-security number . . . [and] (2) the year of the individual's birth." FED. R. CIV. P. 5.2(a)(1), (2).

Defendant contends that it offered to excise the personal information or seal the exhibit entirely when it first received Plaintiff's Motion to Strike, but Plaintiff did not respond.[3] (Doc. No.

---

[3] Plaintiff also did not file a reply to Defendant's response to her motion.

29 at 4 n.4). It further argues that the proper remedy would be to replace the document with a redacted version or seal the exhibit. (*Id.* at 5).

It appears that this issue could have been more swiftly and more efficiently resolved had Plaintiff's counsel heeded this Court's Local Rules and Rules of Civil Procedure, which require motions other than those made under Rules 12(b), 12(c), 12(e), 12(f), and 56 to "contain an averment that (1) [t]he movant has conferred with the respondent and (2) [c]ounsel cannot agree about the disposition of the motion." S.D. TEX. L.R. 7.1D; *see also* Hanen R. Civ. P. 7C (detailing requirements for certificates of conference). Indeed, the Motion to Strike did not include a certificate of conference, as required by this Court's rules.

Given the outsized remedy sought, the existence of less-restrictive remedies, and Plaintiff's failure to abide by the Court's rules, the Court **DENIES** the Motion to Strike Exhibit 4. Nevertheless, to protect Plaintiff's sensitive personal information, the Court **ORDERS** Exhibit 4 to be sealed.

The second exhibit Plaintiff seeks to strike is Exhibit 9, which is an expert opinion (in the form of an unsworn declaration) of Michael Thaler.[4] *See* (Doc. No. 22-9). According to his declaration, Mr. Thaler has extensive experience in law enforcement. He served as a law enforcement officer for over 40 years, during which he has served as the Assistant Chief of Police and Executive Assistant Chief of Police for the City of Houston and the Chief of Police for the City of Pasadena. (*Id.* at 1).

Notwithstanding those qualifications, Mr. Thaler opines on areas that his expertise does not touch. Defendant argues that Mr. Thaler opines on whether Plaintiff's conduct could be considered insubordination. (Doc. No. 29 at 8). Mr. Thaler's declaration, however, goes far beyond that. In

---

[4] While Plaintiff titles this motion a Motion to Strike, it is more appropriately considered a Motion to Exclude because she challenges Mr. Thaler's opinion on *Daubert* grounds. As such, the Court treats the motion as a Motion to Exclude.

his declaration, Mr. Thaler purports to analyze "the civil action filed on behalf of Ms. Suzanne Stewart regarding her allegations of being discriminated against and terminated when she complained of 'inappropriate comments' made by the Mayor which were directed at her." (*Id.* at 3). That, however, is simply the summary of this case. It is the job of this Court to analyze this civil action, not of a non-lawyer expert.

It does not stop there. He further writes that his "conclusions and opinions are based on an analysis of these materials by applying [his] law enforcement and administrative experience, education, and training[] *regarding application of the applicable provisions of Texas and federal laws . . . Texas Administrative Code, Title 37; Texas Local Government Code 614; and Texas Occupational Code § 1701.452(a), (b)*." (*Id.* at 10) (emphasis added). Mr. Thaler even cites to case law. *See* (*id.* at 16) (citing a total of seven cases from the Fifth Circuit, Southern District of Texas, and Northern District of Texas). In short, these are attempts by a non-lawyer expert to offer legal conclusions through a purported legal analysis on a case-dispositive issue. As the Fifth Circuit has clearly expressed, "[e]xperts cannot 'render conclusions of law' or provide opinions on legal issues." *Renfroe v. Parker*, 974 F.3d 594, 598 (5th Cir. 2020).

To be sure, at times, Mr. Thaler opines without rendering conclusions of law. For example, he writes that "[t]here is no greater show of disrespect to the authority of a superior than to publicly challenge the decisions of a ranking officer with the type of profane laden [sic] language and unsupported salacious accusations as those made by the plaintiff." (Doc. No. 22-9 at 16). Nevertheless, the Fifth Circuit has recognized that expert testimony is unnecessary if "the jury could adeptly assess this situation using only their common experience and knowledge." *Peters v. Five Star Marine Serv.*, 898 F.2d 448, 450 (5th Cir. 1990); *see also* FED. R. EVID. 702 (authorizing expert testimony if "the expert's . . . other specialized knowledge will help the terrier of fact to

understand the evidence or to determine a fact in issue"). A jury, using their common experience and knowledge, could adeptly assess that publicly challenging a supervisor with profanity-ridden language while accusing them of extramarital affairs is indeed disrespectful.

Consequently, Mr. Thaler's opinion is at best superfluous and at worst untethered to his qualifications. Thus, the Court **GRANTS** Plaintiff's Motion to Exclude Defendant's Exhibit 9, Declaration of Michael Thaler and will not consider it in its summary-judgment analysis.

### B. Defendant's Motion for Summary Judgment

Plaintiff has two causes of action remaining: (1) hostile work environment claim and (2) retaliation claim, both under Title VII. The Court takes them in turn.

#### i. Hostile Work Environment Claim

To survive summary judgment on a hostile work environment claim under Title VII, Plaintiff must show or raise fact issues that (1) she is a member of a protected class; (2) she suffered unwelcomed harassment; (3) the harassment was based on her membership in a protected class; (4) the harassment "affected a term, condition, or privilege of employment"; and (5) "the employer knew or should have known" about the harassment and "failed to take prompt remedial action." *West v. City of Houston*, 960 F.3d 736, 741–42 (5th Cir. 2020) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)). Notably, "hostile work environment claims are not proven using *McDonnell Douglas* or any other burden-shifting scheme. They rely, for the most part, on direct evidence." *E.E.O.C. v. Bass Pro Outdoor World, LLC*, 35 F. Supp. 3d 836, 857 (S.D. Tex. 2014) (Ellison, J.). Here, Defendant challenges Plaintiff's ability to establish or raise genuine issues of material fact on elements three and four: whether the harassment was based on her membership in a protected class and whether the harassment affected a term, condition, or privilege of employment. (Doc. No. 22 at 16–18).

a.    **Whether the Harassment was Based on Plaintiff's Membership in a Protected Class**

Defendant contends that the comment "overweight lover" "does not refer to gender at all, but to Plaintiff's weight," and that "weight is not a protected classification under Title VII." (Doc. No. 22 at 17). Plaintiff disagrees, because she claims "lover" is sexual in nature. (Doc. No. 26 at 15–16).

The Court concludes that a reasonable jury could find that comment to be sexual in nature, and thus, based on Plaintiff's membership in a protected class, *i.e.*, her gender. First, one of the definitions of "lover" is "a person with whom one has sexual relations." *Lover*, MERRIAM-WEBSTER.COM DICTIONARY (last visited June 18, 2025). Second, the summary-judgment record shows that Mayor Burton frequently made sexual comments to other women under his supervision, providing further context to the "overnight lover" comment. For example, Plaintiff swears in her affidavit that Mayor Burton commented "I'd bump that bunny" and "She's my speed" about another woman, Arika Carr. (Doc. No. 26-1 at 2). *Cf. Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 403 n.12 (5th Cir. 2021) ("Forms of harassment that might seem neutral in terms of race . . . can contribute to a hostile work environment claim if other evidence supports a reasonable inference tying the harassment to the plaintiff's protected status.") (quoting *Cole v. Bd. of Trustees of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016)).

Third, and perhaps most importantly, Mayor Burton admitted in his deposition that he has never called a *male* employee of the City his "lover." (Doc. No. 26-3 at 19:3–5). *See Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 401–02 (5th Cir. 2013) (reversing summary judgment on a hostile work environment claim based on "sniffing and hovering" of two men over a woman because, in part, "it is difficult to imagine the maintenance men sniffing and hovering over Royal [the plaintiff] if she were a man"). Here, like in *Royal*, not only is it difficult to see Mayor Burton

9

calling another man a "lover," but he also has testified that he, in fact, has never done so. Given the sexual denotation of the word "lover," sexually remarks about other women, and the fact that Mayor Burton has never called another male employee a "lover," a reasonable jury could conclude that the "overweight lover" comment related to Plaintiff's gender.

Defendant argues in its reply in support of its motion that portions of Plaintiff's declaration potentially relevant to this element should be stricken as being conclusory and not based on personal knowledge. *See* (Doc. No. 28 at 2). Specifically, it argues that (1) Plaintiff's assertion that the phrase "overweight lover" has a sexual connotation is a self-serving conclusory assertion that should be disregarded; and (2) Plaintiff's declaration that Mayor Burton has never called any employee an "overweight lover" is not based on personal knowledge and thus be stricken. (*Id.*). As apparent from above, however, the Court relies on neither of those statements to reach its conclusion that a reasonable jury could conclude that the phrase "overweight lover" could be based on Plaintiff's gender. The Court concluded that such a phrase is sexual in nature based on (1) its dictionary definition; (2) other evidence of Mayor Burton's conduct that support a reasonable inference that the comment was tied to Plaintiff's protected status; and (3) *Mayor Burton*'s own deposition—not Plaintiff's declaration—that he has never called a male employee of the city his "lover." Thus, Defendant's request to strike those portions of Plaintiff's declaration is **DENIED as moot**.

### b. Whether the Harassment Affected a Term, Condition, or Privilege of Plaintiff's Employment

"Discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII." *Wallace v. Tex. Tech Univ.*, 80 F.3d 1042, 1049 n.9 (5th Cir. 1996). "This element is disjunctive," and thus, if a single conduct "was severe enough on its own

10

to create a hostile work environment, then it need not have been pervasive for this element to be satisfied." *Abbt v. City of Houston*, 28 F.4th 601, 608 (5th Cir. 2022). "In order to deem a work environment sufficiently hostile, 'all of the circumstances must be taken into consideration.'" *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 651 (5th Cir. 2012) (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)). "This includes the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (internal quotes omitted).

Here, the alleged harassment occurred on multiple occasions. Moreover, it was sufficiently severe to alter the conditions of Plaintiff's employment. The alleged act of calling Plaintiff an "overweight lover" occurred during a *city-wide* barbecue cook-off. (Doc. No. 26-2 at 3). "[A]bout 200 to 300 people" were in attendance. (*Id.*). Further, the comment was made "on the microphone . . . when announcing that [her] team won the barbecue competition." (*Id.*). That meant not only that the comment was amplified to the crowd, but also that it was made when the hundreds of people in attendance were paying attention to hear who won the city-wide competition. Lastly, the comment came not from any layperson, but from the mayor of the city. Consequently, a reasonable jury could conclude that such a comment made so publicly to a sizeable crowd by a central, authoritative figure in the city was severe enough to affect the conditions of her employment. Defendant's Motion for Summary Judgment is thus **DENIED**.

### ii. Retaliation Claim

Plaintiff alleges that her employment was terminated in retaliation for complaining about what she believed to be unlawful discrimination. (Doc. No. 1 at 4). The antiretaliation provision of Title VII "prohibits an employer from discriminating against an employee or job applicant

11

because that individual opposed any practice made unlawful by Title VII or made a charge, testified, assisted, or participated in a Title VII proceeding or investigation." *Brown v. Wal-Mart Stores East, L.P.*, 969 F.3d 571, 576–77 (5th Cir. 2020) (internal quotes and modifications omitted).

"Where, as here, a retaliation case is based on circumstantial evidence, [courts] apply the *McDonnell Douglas* framework." *Id.* at 577. Under that framework, Plaintiff "has the burden to prove a prima facie case of retaliation by showing (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action." *Id.* (internal quotes omitted). Only the first and third elements are at issue here. *See* (Doc. No. 22 at 19–22).

If Plaintiff establishes a prima facie case, "then the employer has the burden of production to provide a legitimate, non-discriminatory reason for the adverse employment action." *Id.* (internal quotes committed). If the employer meets this burden, then Plaintiff has the burden to prove that the proffered reason is pretextual. *Id.* Plaintiff may establish pretext "by showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence." *Id.*

"Ultimately, in order to survive a motion for summary judgment, a plaintiff must show a conflict in substantial evidence on the question of whether the employer would not have taken the adverse employment action but for the protected activity." *Id.* "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.*

### a. Prima Facie Case Element One: Whether Plaintiff Engaged in Protected Activity

"An employee engages in protected activity when she opposes an employment practice that she 'reasonably believes' violated Title VII." *Wallace v. Performance Contractors, Inc.*, 57 F.4th

12

209, 224 (5th Cir. 2023). "[S]tating one's belief that discrimination has occurred 'virtually always' constitutes opposition, except in 'eccentric cases.'" *Id.* (quoting *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276–77 (2009)).

Here, Plaintiff has produced sufficient evidence to establish this prima facie element. Both Plaintiff and Chief Stewart swear in their respective affidavits that, the week after the alleged "overweight lover" comment at the city-wide barbecue cook-off, Plaintiff "verbally made an official report to Chief Raymond Stewart for Fred Burton sexually harassing [Plaintiff]." (Doc. No. 26-1 at 3); (Doc. No. 26-2 at 3). Chief Stewart further swears that he "relayed [Plaintiff's] sexual harassment complaint to Mayor Fred Burton." (Doc. No. 26-2 at 3). Complaining to her direct supervisor that she experienced what she believes to be gender discrimination satisfies this element of Plaintiff's prima facie case.

Defendant makes two arguments in opposition, but both fail. First, it argues that, since "overweight lover" is a gender-neutral phrase, it is not actionable under Title VII, and complaints about conduct not actionable under Title VII cannot constitute a protected activity. (Doc. No. 22 at 20–21). The standard is not whether the conduct is, with legal certainty, actionable under Title VII, but rather whether Plaintiff "reasonably believes" violates Title VII. *See Wallace*, 57 F.4th at 224). Moreover, as explained above, a reasonable jury could believe—and thus, Plaintiff could reasonably believe—that "overweight lover" is sexual in nature. Accordingly, this argument fails.

Second, Defendant argues that the portion of Plaintiff's declaration stating that she made a verbal complaint to Chief Stewart should be stricken as a sham affidavit. (Doc. No. 28 at 3). The basis for that argument is the perceived contradiction between, on the one hand, Plaintiff's statement in her affidavit that she made an official report to her supervisor and, on the other hand, Plaintiff's deposition, in which the following exchange occurred:

13

Q [by Defense Counsel]: The only document that we've looked at today that you've identified, so far, as a complaint you made about your gender, is the overweight-lover complaint email you sent to the mayor on June 3rd, 2021, Stewart 20. Those are the only — that's the only one we've looked at today, so far, right?

A [by Plaintiff]: Yes.

According to Defendant, Plaintiff's affidavit contradicts her deposition, which Defendant interprets as her testifying that she has made no other complaints other than the June 3 email.

The Court declines to strike such portions of the affidavit. As the Fifth Circuit has explained, "the bar for applying the [sham-affidavit] doctrine is a high one, typically requiring affidavit testimony that is 'inherently inconsistent' with prior testimony." *Seigler v. Wal-Mart Stores Tex., L.L.C.*, 30 F.4th 472, 477 (5th Cir. 2022). Here, the affidavit is not inherently inconsistent with the deposition. The question asked at the deposition was whether the only document the counsel and Plaintiff discussed at the deposition was the June 3 email. It does not ask whether that email was the only complaint *made*—only whether it was the only document regarding the complaint they "looked at [that day], so far." Moreover, Plaintiff's affidavit clearly states that her complaint to Chief Stewart was verbal, and thus, no documentation would have been made. *See* (Doc. No. 26-1 at 3).

Finally, even if the Court did strike those portions of Plaintiff's affidavit, Chief Stewart's affidavit suffices to establish this element of the prima facie case. Independently of Plaintiff's affidavit, Chief Stewart swears to the same facts: that on the week following the city-wide barbecue event, Plaintiff lodged a verbal complaint regarding the "overweight lover" comment. (Doc. No. 26-2 at 3). Defendant points to no previous testimony of Chief Stewart's that is inherently inconsistent with that statement.

Accordingly, either through Plaintiff's affidavit, Chief Stewart's affidavit, or both, Plaintiff has satisfied the first element of her prima facie case.

14

**b.** **Prima Facie Case Element Three: Whether a Causal Connection Exists between the Protected Activity and the Adverse Employment Action**

"At the prima facie case stage, a plaintiff can meet [her] burden of causation simply by showing close enough timing between [her] protected activity and [her] adverse employment action." *Brown*, 969 F.3d at 578 (quoting *Garcia v. Pro. Cont. Servs., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019)) (modifications omitted). "The protected act and the adverse employment action must be very close in time to establish causation by timing alone." *Id.* The Fifth Circuit has held that a period of two-and-a-half months, a period of two months, and a period of six-and-a-half weeks are close enough to show a causal connection. *See id.* (collecting cases). In *Brown* itself, the Fifth Circuit held that a period of seven weeks and three days between the plaintiff's first report to her termination was sufficient to meet the plaintiff's prima facie burden on causation. *See id.*

Here, the temporal gap between Plaintiff's verbal report and her termination was only about a month—far short of other instances in which the Fifth Circuit has found sufficient temporal proximity to satisfy this element. The barbecue cook-off at which Mayor Burton publicly called Plaintiff an "overweight lover" was on November 12, 2021. (Doc. No. 26-1 at 3). Between November 15 and November 19, 2021, Plaintiff made a complaint to Chief Stewart. (*Id.*). Between November 29 and December 3, 2021, Chief Stewart relayed the complaint to Mayor Burton. (Doc. No. 26-2 at 3). Plaintiff was terminated on December 14, 2021. (Doc. No. 26-1 at 3). The record thus shows only a month-and-two-days period between the reporting of sexual harassment and termination. That gap becomes even shorter if counted from when Mayor Burton was apprised of the complaint—to only two weeks. Whether the temporal proximity is a month or two weeks, both are much shorter than what the Fifth Circuit has concluded was sufficient to show the prima facie case of causation. Therefore, the Court also concludes that the month-long period between the complaint and the termination was sufficient to show causation at this prima facie case stage.

     **c.**     **Whether Defendant Has Produced a Legitimate, Non-Discriminatory Reason for the Adverse Employment Action**

Since Plaintiff has established a prima facie case, Defendant now "has the burden of production to provide a legitimate, non-discriminatory reason for the adverse employment action." *Brown*, 969 F.3d at 577. Here, Defendant's proffered legitimate, non-discriminatory reason is Plaintiff's alleged insubordination and unprofessionalism. (Doc. No. 22 at 23). Defendant points to Plaintiff's own deposition, in which Plaintiff testified that, after Mayor Burton announced Chief Stewart's discharge as Chief of Police, she confronted Mayor Burton and stated as follows:

> You guys [Mayor Burton and Chief Stewart] have been friends for 30-plus years. He's given you all this time, free, for the City. You should be ashamed of yourself. How do you sleep at night? You're — you're allowing your girlfriend to dictate how you handle the police department.

(Doc. No. 55 at 11–16). By referring to Mayor Burton's "girlfriend," Plaintiff testified that she was also accusing Mayor Burton of having an extramarital affair with the City Manager, Dr. Goldberg. (*Id.* at 63:1–12).

Defendant has also produced the letter of termination, signed by Mayor Burton, to Plaintiff, informing her of her termination and stating that her "termination is a direct result of policy violations related to insubordination and [her] unprofessionalism." (Doc. No. 22-2). Indeed, Arcola Police Department's Policy 200, titled Professional Standards, states that "[c]hallenging the authority of any superior officer or supervisor by obvious disrespect or by disputing his or her orders shall . . . be deemed insubordination." (Doc. No. 22-3 at 2). Therefore, Defendant has carried its burden of production to show a non-discriminatory reason for Plaintiff's termination.

     **d.**     **Whether the Proffered Reason is Pretextual**

Once the employer meets its burden to produce a non-discriminatory reason, the burden shifts back to Plaintiff to establish, or at least raise genuine issues of material fact, that the proffered reason is pretextual. *Brown*, 969 F.3d at 577. She may establish pretext or raise fact issues on

pretext "by showing that a discriminatory motive more likely motivated her employer's decision, such as through evidence of disparate treatment, or that her employer's explanation is unworthy of credence." *Id.* "Ultimately . . . a plaintiff must show a conflict in substantial evidence on the question of whether the employer would not have taken the adverse employment action but for the protected activity." *Id.*

Here, Plaintiff has demonstrated a conflict in substantial evidence on whether her protected activity is a but-for cause of her termination. First and foremost is Chief Stewart's declaration, in which Chief Stewart swears that when he asked Mayor Burton "why he was doing all of this" (regarding Plaintiff's termination and designating it as dishonorable discharge), Mayor Burton responded, "Because Suzanne [Plaintiff] can't let shit go. They gonna learn." (Doc. No. 26-2 at 4). When inferences are drawn in Plaintiff's favor, as they must at this stage, a reasonable jury could conclude that Mayor Burton meant Plaintiff cannot "let go" of Mayor Burton calling her an "overweight lover."

Second, the sequence of events leading up to Plaintiff's termination supports a claim of pretext. Mayor Burton allegedly called Plaintiff an "overweight lover," after which Plaintiff made a report to Chief Stewart. Then Chief Stewart relayed the report to Mayor Burton. Soon thereafter, Mayor Burton discharged Chief Stewart from his chiefship, stating, "I am removing the Stewart umbrella of protection. I'm the Chief now. *Stewart keeps telling me not to say stuff*, but I'm the mayor, and I'm the chief." (Doc. No. 26-2 at 4) (emphasis added). After terminating Plaintiff, Mayor Burton repeated, again, that he is "the mayor and the chief now, and [he] can do what [he] want[s]." (*Id.*). If believed by the jury, from this evidence, a reasonable jury could conclude that, once Mayor Burton was apprised that Plaintiff made a complaint of sexual harassment against him, he "remov[ed] the Stewart umbrella of protection," not only because Chief Stewart acted as a

17

check on his alleged harassment, but also so that he can do "what [he] want[s]" as the "mayor and the chief"—including terminating, without further check on his authority, the person lodging such complaints. These instances, occurring in quick succession after Plaintiff's complaint of sexual harassment, and these comments, indicating the decision-maker's then-existing state of mind, cast sufficient doubt on the City's proffered reason of insubordination that a reasonable jury could conclude the proffered reason is "unworthy of credence."

Consequently, Plaintiff has sufficiently demonstrated, at least at this summary-judgment stage, that her protected activity was the but-for cause of her termination by casting sufficient doubt on the proffered reason. Defendant's Motion for Summary Judgment as to the retaliation claim is thus **DENIED**.

## IV.    Conclusion

For the foregoing reasons, the Court **DENIES IN PART** and **GRANTS IN PART** Plaintiff's Motion to Strike. (Doc. No. 24). Defendant's Exhibit 4, (Doc. No. 22-4), is hereby **ORDERED** to be sealed. The Court also **DENIES** Defendant's Motion for Summary Judgment. (Doc. No. 22).

It is so ordered.

Signed on this the 24 day of June, 2025.

Andrew S. Hanen
United States District Judge